**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge William J. Martínez**

Civil Action No. 20-cv-1989-WJM-MEH

TISHA LEE,

      Plaintiff,

v.

DENVER PUBLIC SCHOOLS; and
DAVID SUPPES, in his individual and official capacities,

      Defendants.

---

**ORDER GRANTING IN PART AND DENYING IN PART
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

---

This case is before the Court on Defendants Denver Public Schools ("District")
and David Suppes's, in his individual and official capacities, (jointly "Defendants"),
Motion for Summary Judgment.  (ECF No. 66.)  Plaintiff Tisha Lee filed a response.
(ECF No. 94.)  Defendants filed a reply.  (ECF No. 80.)  For the following reasons, the
Motion for Summary Judgment is granted in part and denied in part.

## I. STANDARD OF REVIEW

Summary judgment is warranted under Federal Rule of Civil Procedure 56 "if the
movant shows that there is no genuine dispute as to any material fact and the movant is
entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Anderson v.
Liberty Lobby, Inc.*, 477 U.S. 242, 248–50 (1986).  A fact is "material" if, under the
relevant substantive law, it is essential to proper disposition of the claim.  *Wright v.
Abbott Labs., Inc.*, 259 F.3d 1226, 1231–32 (10th Cir. 2001).  An issue is "genuine" if

the evidence is such that it might lead a reasonable trier of fact to return a verdict for the nonmoving party. *Allen v. Muskogee*, 119 F.3d 837, 839 (10th Cir. 1997).

In analyzing a motion for summary judgment, a court must view the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party. *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). In addition, the Court must resolve factual ambiguities against the moving party, thus favoring the right to a trial. *See Houston v. Nat'l Gen. Ins. Co.*, 817 F.2d 83, 85 (10th Cir. 1987).

## II. MATERIAL FACTS[1]

### A.   Selection Process for Executive Director

Emily Griffith Technical College ("EGTC") is a technical college affiliated with the District, and EGTC employees are District employees. (ECF No. 66 ¶ 1.) In early 2019, then-EGTC Executive Director, Jeff Barratt, announced his resignation, and the District began the search process for a new Executive Director. (ECF No. 66 ¶ 2.) EGTC's Director of Business Services, Zach Hermsen, was appointed as Interim Executive Director. (ECF No. 66 ¶ 2.) David Suppes, the District's Chief Operating Officer at the time, supervised the Executive Director and served as hiring manager for the open position. (ECF No. 66 ¶ 4.) The hiring manager is the person making the decision or recommendation about who to hire for an open position. (ECF No. 66 ¶ 4.) According to Defendants, Superintendent Susana Cordova had the final hiring authority for the position, though Plaintiff states that while Cordova could say no to Suppes's chosen

---

[1] The following factual summary is based predominantly on the parties' briefs on the Motion for Summary Judgment and documents submitted in support thereof. All citations to docketed materials are to the page number in the CM/ECF header, which sometimes differs from a document's internal pagination. Facts disputed by the parties are noted as such.

candidate, she looked to him to run the process, he chose the two finalists, and he recommended that she hire Stephanie Donner.  (ECF No. 66 ¶ 5; ECF No. 94 ¶ 5.)

The District's Executive Recruiter, Nicole Kramis, assisted Suppes with the search process.  (ECF No. 66 ¶ 6.)  Suppes met with Hermsen; then-Director of Workforce Development and Career Services, Barbara Lindsay; Plaintiff, who is an African American female and at all relevant times was Director of Student Services; and Director of Academics, Linda Van Doren, to discuss the position and receive feedback about what the directors were looking for in a new Executive Director.  (ECF No. 66 ¶ 7.)  Suppes asked whether there was an Executive Director job description and for feedback about it.  (ECF No. 66 ¶ 8.)  Kramis posted a job posting for the position, though it is undisputed that there were multiple job descriptions for the Executive Director position.  (ECF No. 66 ¶ 9; ECF No. 94 ¶¶ 10–12.)

Among other things, Kramis's job posting included as essential functions of the job: "work with CDHE and the Colorado legislative process to ensure fiscal stability for the institution via higher education allocation funding;" "serve as a quasi-lobbyist and advocate for CTE with the state legislature to ensure continued support and funding for Area Technical Colleges;" "develop and maintain an active program of search and solicitation for alternative funding and resources;" and "develop a strong political base with external stakeholders to assure that EGTC maintains a positive and highly visible public profile."  (ECF No. 66 ¶ 10.)  The "knowledge and qualifications" of the posting included: "Knowledge of higher education practices and policies; History of securing funding through grants, business and industry donations, or alternative funding; Demonstrated knowledge of working with legislative and government agencies and

processes;" and "excellent written and oral communication skills."  (ECF No. 66 ¶ 11.)
In the posting, the stated education and licensure requirements were: "master's degree
or higher in education or related field;" "previous experience in CTE;" "experience in
higher education and workforce development and training preferred;" and "work
experience in business or industry preferred."  (ECF No. 66 ¶ 12.)  The "executive
team"[2] agreed it was important for the job posting to stress higher education
experience—a minimum of seven years' worth—when selecting a candidate.  (ECF No.
94 ¶ 16.)

The District received numerous applications for the position, including from Lee
(African American); Van Doren (Caucasian); Beth Bean (Caucasian); and Stephanie
Donner (Caucasian).  (ECF No. 66 ¶ 13.)  Plaintiff has over two decades of higher
education and continuing technical education experience and possessed the
qualifications for the Executive Director position.  (ECF No. 94 ¶ 1.)  Additionally,
Plaintiff had a demonstrated ability to raise funds and win government grants, and she
had increased concurrent enrollment at EGTC by 25% in a three-year span.  (ECF No.
94 ¶¶ 2–3.)

Although Plaintiff disputes that the process was followed, the selection process
consisted generally of four parts: Suppes met with candidates and determined who
would move to the panel interviews; the selected candidates participated in a first panel
interview; then the candidates participated in second panel interview; and the finalists
interviewed with the District's then-Superintendent Susana Cordova and Assistant

---

[2]  The parties use the term "executive team" in their briefing, but nowhere define it.  For
purposes of this Order the Court assumes it is a reference, collectively, to some or all of the
individuals involved in some capacity in the search for the new Executive Director.

Superintendent Tamara Acevedo.  (ECF No. 66 ¶ 16.)  Suppes decided Plaintiff, Van Doren, Donner, and Bean should advance to two panel interviews.  (ECF No. 66 ¶ 17.) Both panels were intended to be screening panels.  (ECF No. 94 ¶ 18; ECF No. 80 ¶ 18.)

**B.      Interview Process**

It is undisputed that the interview process was "chaotic."  (ECF No. 66 ¶ 19.) Suppes's Administrative Assistant, Sally Bustamante, made numerous mistakes during the process.  (ECF No. 66 ¶ 21–22.)  Bustamante was responsible for inviting candidates and panelists to the first panel interview on March 20, 2019, but she sent multiple calendar invitations to Plaintiff and Donner that included multiple different times and locations for the interview.  (ECF No. 66 ¶ 24.)  Additionally, Bustamante sent e-mails to incorrect addresses for panelists, so only one of the four original panelists showed up for the first panel interview.  (ECF No. 66 ¶ 25–26.)  Kramis scrambled to find replacement panelists, who ultimately were EGTC's Marketing Manager, Kevin Mohatt (Caucasian); EGTC's Dental Assistant Programming Director and Instructional Coach, Brenda Stevens (Caucasian); and EGTC's Recruiting Coordinator, Tayseer Abdallah (African-American), although Abdallah[3] missed Bean's interview.  (ECF No. 66 ¶ 28.)

After the interview, the panelists discussed the candidates and ranked Bean and Donner as their top two candidates.  (ECF No. 66 ¶¶ 29–30.)  All four candidates, including Bean, Donner, Plaintiff, and Van Doren, advanced to a second panel interview.  (ECF No. 66 ¶ 32.)

---

[3] Defendants spell Abdallah with and without an "h."  The Court does not know which is correct.

C.      **Second Panel Interview**

Bustamante again had difficulties inviting candidates to the second panel

interview, and she sent multiple calendar invitations to Plaintiff and Donner for their

interviews.  (ECF No. 66 ¶ 33–34.)  The panelists for the second panel interview were

Hermsen (Caucasian); EGTC Foundation Board Member, Leslie Mitchell (race

unknown); the District's Executive Director of CareerConnect, Lauren Trent

(Caucasian); EGTC High School Principal, David Daves (Caucasian); CEO of the

Independent Electrical Contractors' Union, Marilyn Stansbury (race unknown); and

EGTC Foundation President and CEO, Tatiana Hernandez (Hispanic), who was not a

District employee.[4]  (ECF No. 66 ¶ 35.)  After the interviews, the panelists discussed the

candidates; Kramis took notes during the discussion, though no notes were produced in

discovery.  (ECF No. 66 ¶¶ 36–37.)

During the discussion, Hernandez "raised a concern that Ms. Lee's grammar was

a concern and that being a person of color, she should be held to a higher standard."

(ECF No. 66 ¶ 38; ECF No. 94 ¶ 22.)  Hermsen witnessed the racial comments made

about Plaintiff during the interview debrief.  (ECF No. 94 ¶ 35.)  Defendants also state

that Hernandez questioned Plaintiff's fundraising ability, but she did not relate her

concerns about fundraising to Plaintiff's race.  (ECF No. 66 ¶ 39.)  Questions involving

Plaintiff's fundraising ability were raised by the first and second interview panels.  (ECF

No. 66 ¶ 46.)  Lindsay wrote Hernandez's comments on her rubric rating the

candidates, but she did not note that the comments were discriminatory.  (ECF No. 66 ¶

40.)  When Hernandez finished talking, Lindsay stood up for Plaintiff, stating that she

---

[4] Although Defendants do not list her, the Court believes Barbara Lindsay was also at
the second panel interview.

had worked with Plaintiff, that Plaintiff was always professional, and that the comments about her grammar should be disregarded.  (ECF No. 66 ¶ 41; ECF No. 94 ¶ 23.) Further, Lindsay stated that she attended fundraising events with Plaintiff and that Plaintiff knew people to contact to raise funds for EGTC.  (ECF No. 66 ¶ 42.)

Ultimately, the second panel recommended that Bean and Plaintiff advance to the final interview.  (ECF No. 66 ¶ 45.)  Plaintiff's race was not mentioned in the summary notes from either panel.  (ECF No. 66 ¶ 46.)  The summary of the second panel's debrief included that Plaintiff lacked "polish" and had oversold her fundraising ability.  (ECF No. 94 ¶ 24.)

**D.    Final Interview Selection**

Bustamante asked Kramis which candidates the panelists liked, and Kramis told her that the second panel liked several candidates, including Plaintiff.  (ECF No. 66 ¶¶ 48–49.)  Bustamante understood Kramis's comments to mean that she should invite Plaintiff to a final interview with Cordova and Acevedo.  (ECF No. 66 ¶ 50.)  However, according to Defendants, Suppes, who was tasked with deciding which candidates to send to the final interview, had not yet decided which two candidates he wanted to move forward in the process.  (ECF No. 66 ¶ 51.)  By contrast, Plaintiff claims that Suppes preselected Donner, and the panel interviews were a sham.  (ECF No. 94 ¶ 51.)

Nonetheless, Bustamante invited Plaintiff and Bean to the final interview without confirming with Suppes that they were the two final candidates he wanted to interview with Cordova and Acevedo.  (ECF No. 66 ¶ 52.)  Kramis e-mailed Suppes to confirm the selections of Bean and Plaintiff were correct, and Suppes, who had not yet determined who the finalists were, demanded to know what happened and directed Kramis to

cancel the interviews until he had selected finalists for the position.  (ECF No. 66 ¶¶ 55–56.)

On April 11, 2019, Kramis called Plaintiff and told her the interview was canceled and the District would be in touch with next steps.  (ECF No. 66 ¶ 57; ECF No. 94 ¶ 28.)

Defendants state that Suppes was not required to advance the candidates selected by either the first or second panels.  (ECF No. 66 ¶ 58.)  Knowing that the Executive Director would have to work with members of the first panel, Defendants state that Suppes considered the feedback from both panels.  (ECF No. 66 ¶ 60.)  According to Defendants, Suppes struggled with the conflicting feedback, where the first panel selected Bean and Donner, and the second panel selected Bean and Plaintiff.  (ECF No. 66 ¶ 61.)

Ultimately, Suppes selected Bean and Donner, not Plaintiff, to interview with Cordova.  (ECF No. 66 ¶ 62.)  Suppes "liked" Lee and thought she had some good qualities.  (ECF No. 66 ¶ 63.)  He understood that she was well-respected at EGTC, doing well at her job as the Director of Student Services, and an asset to EGTC.  (ECF No. 66 ¶ 63.)  However, he "did not think she had demonstrated that she had run a large organization, supervised a large number of people, led complex—very complex initiatives."  (ECF No. 66 ¶ 63.)  He "did not have the comfort that she had that type of background and experience."  (ECF No. 66 ¶ 63.)  According to Defendants, Plaintiff's fundraising totals were much less than Donner's totals, and while Suppes gave Plaintiff credit for the work she did, he did not think it was significant.  (ECF No. 66 ¶ 64.)

Plaintiff had been Director of Student Services since 2014, but her job duties did not consist of fundraising.  (ECF No. 66 ¶ 65.)  Rather, she oversaw admissions,

including recruitment, advising, financial aid, ADA, mental health, student records, schedules, registration, and tutoring. (ECF No. 66. ¶ 66.) She did not work directly with the Colorado legislature; instead, she provided data to EGTC's lobbyist about ten times and attended two to three hearings at which she did not testify. (ECF No. 66 ¶ 67.)

**E.     Donner**

Suppes states that he advanced Donner to the final interview because he believed she demonstrated stronger leadership skills and the ability to work in complex organizations. (ECF No. 66 ¶ 68.) Donner has a Bachelor of Arts in Government from the University of Texas and a Juris Doctor from the University of Houston Law Center. (ECF No. 66 ¶ 69.) From May 2011 until July 2015 she worked for then-Governor John Hickenlooper in various capacities, including as the Senior Deputy Legal Counsel, Executive Director and General Counsel Governor's Office of Recovery, Deputy Chief of Staff, and then as Chief Legal Counsel. (ECF No. 66 ¶ 70.) While she worked in the Governor's office, she did a great deal of work around workforce development. (ECF No. 66 ¶ 71.) She also worked with the Governor to establish the BEL Commission, which is the leading commission in the state of Colorado around apprenticeships, workforce development, and accelerated learning opportunities. (ECF No. 66 ¶ 71.)

In 2015, Donner was recruited to work at Galvanize, Inc., an accelerated learning, competency-based educational institution that teaches technical education, similar to EGTC. (ECF No. 66 ¶ 72.) Galvanize provides short-form learning opportunities in software engineering and data science. (ECF No. 66 ¶ 72.) It offers full and part-time courses, has campuses in eight cities and online, and raises funds through a non-profit foundation similar to EGTC's Foundation. (ECF No. 66 ¶  72.)

Galvanize is regulated by state and federal agencies as an educational institution and is licensed by Colorado's Department of Higher Education.  (ECF No. 66 ¶ 72.)

Donner worked at Galvanize from July 2015 through March 2018.  She served as Galvanize's Chief Legal, People, and Government Affairs Officer/Corporate Secretary. She was also the president of the Galvanize Foundation, a 501(c)(3) organization. (ECF No. 66 ¶ 73.)  Donner performed a significant amount of fundraising for Galvanize both in her position as the Chief Legal and People Officer and as President of Galvanize's Foundation.  (ECF No. 66 ¶ 74.)  She raised over $47 million in funding. (ECF No. 66 ¶ 74.)  Donner also worked closely with then-U.S. Representative Jared Polis on various competency-based education bills in the United States Congress. (ECF No. 66 ¶ 75.)  In March 2019, Donner was confirmed to serve as a commissioner for the Colorado Department of Higher Education.  (ECF No. 66 ¶ 76.)

Donner did not have seven plus years of higher education or career technical education experience, which Plaintiff states was required by one of the job descriptions. (ECF No. 94 ¶ 7.)  Mark Ferrandino is the former Speaker of the House of Representatives in the Colorado legislature.  (ECF No. 94 ¶ 10.)  During the relevant time here, Ferrandino was CFO of Denver Public Schools, and he called Suppes personally to recommend Donner for the Executive Director position, stressing that she was a very good friend of his; it is undisputed that he did not know the job description or requirements for the position when he recommended Donner.  (ECF No. 94 ¶¶ 9, 11.) Ferrandino also directly forwarded Donner's cover letter and resume to Suppes.  (ECF No. 94 ¶ 13.)

Suppes considered Donner's experience at Galvanize to be higher education

experience.  (ECF No. 66 ¶ 80.)  In addition to her experience and fundraising abilities, according to Defendants, Suppes also believed Donner had a deep understanding of how government worked, understood education laws and policies, and was in a better position to successfully work with people in state and local government to advance the needs of EGTC and its students based on her work with Governor Hickenlooper and the state legislature.  (ECF No. 66 ¶ 77.)  Suppes understood that Donner had significant fundraising experience from her work at Galvanize.  (ECF No. 66 ¶ 78.)

Defendants state, though Plaintiff disputes, that Hernandez's comments had no impact on Suppes's decision to advance Bean and Donner and not Plaintiff.  (ECF No. 66 ¶ 81.)

Kramis told Plaintiff she had not been selected to interview with Cordova and Acevedo.  (ECF No. 66 ¶ 83.)  Cordova selected Donner as Executive Director.  (ECF No. 66 ¶ 84.)  Defendants state, and Plaintiff does not dispute, that Plaintiff has no evidence that Cordova discriminated or retaliated against her.  (ECF No. 66 ¶ 85.)

F.    **Plaintiff Files Charges of Discrimination**

When Lindsay learned that Plaintiff had been uninvited to the final interview, she told Plaintiff about Hernandez's comments.  (ECF No. 66 ¶ 87.)   Plaintiff filed a charge of discrimination ("First Charge") with the Equal Employment Opportunity Commission ("EEOC") on April 26, 2019, alleging that she was not selected for the Executive Director position because of her race.  (ECF No. 66 ¶ 88.)  To support her allegations, she stated that a panelist told her about Hernandez's comments; she did not identify Lindsay as the person who provided her with the information she used in her Charge; indeed, she did not identify Lindsay at all.  (ECF No. 66 ¶ 89.)

11

Plaintiff filed another charge of discrimination on July 18, 2019 ("Second Charge"), alleging the same things as in the First Charge; she did not identify Lindsay in that charge either.  (ECF No. 66 ¶ 90.)  Plaintiff admits that she does not recall telling anyone at EGTC that Lindsay is the person who provided her with the information that she used in her discrimination charges, nor did she provide anyone at the District with that information.  (ECF No. 66 ¶ 91.)

**G.      Donner's Knowledge**

Although Hermsen met with Donner, he did not discuss the EGTC hiring process with her at all.  (ECF No. 66 ¶ 92.)  He did not tell Donner about Hernandez's comments about Plaintiff or that Lindsay objected to them and stood up for Plaintiff; further, he did not know that Lindsay provided information to Plaintiff, which Plaintiff used in the discrimination charges filed with the EEOC.  (ECF No. 66 ¶ 93.)  Lindsay was not involved in those meetings and does not know what was discussed.  (ECF No. 66 ¶ 94.)  Defendants state, though Plaintiff disputes, that Donner did not know about Hernandez's comments about Plaintiff, about Lindsay's objections to the comments, or that Lindsay provided the information to Plaintiff that Plaintiff used in her discrimination charges until after Lindsay's employment was terminated.  (ECF No. 66 ¶ 96.)

**H.      Lindsay's Termination**

In March 2019, Lindsay earned a substantial raise for her performance and willingness to take on additional responsibilities.  (ECF No. 94 ¶ 42.)  On July 2, 2019, Hermsen; Donner; Human Resources Business Partner, Jo Caldwell; and Abdallah received a complaint from a former EGTC employee.  (ECF No. 66 ¶ 97.)  Jacob Vigil, one of Lindsay's direct reports who had resigned about two months prior, alleged,

among other things, that Lindsay subjected him to a hostile work environment, discriminated against Hispanics, paid a Caucasian employee, Byron O'Bayley, for work he did not perform, and interfered with the hiring process for a position on her team. (ECF No. 66 ¶ 97.)  Hermsen directed Caldwell to investigate Vigil's allegations.  (ECF No. 66 ¶ 98.)  It is undisputed that Caldwell did not know during her investigation or before Lindsay's termination that Lindsay objected to Hernandez's comments during the hiring process or that Lindsay provided information to Plaintiff.  (ECF No. 66 ¶ 113.)

At the conclusion of the investigation, Caldwell made a preliminary determination that based on the fact that the pivot table she reviewed showed that O'Bayley received pay for his career services job during a time when he admittedly was not performing career services job duties, Vigil's allegation Lindsay improperly allowed O'Bayley to receive pay for work he did not perform was founded.  (ECF No. 66 ¶ 102.)  Caldwell presented the investigation findings to Donner and drafted a termination letter that stated that Lindsay misused organization funds, engaged in unprofessional conduct, and interfered with the integrity of the hiring process.  (ECF No. 66 ¶ 107.)  It is undisputed that the District's legal department was heavily involved with Lindsay's termination, and Caldwell stated that the firing was the legal department's decision. (ECF No. 94 ¶ 40.)  Donner consulted with her supervisor, Executive Director of Career and College Readiness, Bernard McCune, and determined that Lindsay should be terminated based on the investigation's findings.  (ECF No. 66 ¶ 108; ECF No. 94 ¶ 41.) Donner notified Lindsay that she was recommending termination, and Lindsay's employment was terminated effective July 31, 2019.  (ECF No. 66 ¶ 110.)

Defendants state that at the time she recommended termination, Donner did not

know that Lindsay had objected to any comments or that she had stood up for Lee during the Executive Director interview process, nor did she know that Lindsay had provided Lee with information for use in her discrimination charges.  (ECF No. 66 ¶ 111.)  Defendants state that Donner did not even know that Plaintiff filed discrimination charges until late August or early September 2019, after Lindsay's termination.  (ECF No. 66 ¶ 112.)

Donner voluntarily resigned her position in 2020 for reasons unrelated to Lindsay.  (ECF No. 66 ¶ 116.)

## I.   District Policies

District policies AC and GBA, in place at all relevant times, prohibit discrimination and retaliation.  (ECF No. 66 ¶ 114.)  District policy CBA/CBC delegates all employment decisions to the Superintendent, except as prohibited by law.  (ECF No. 66 ¶ 115.)

## III. PROCEDURAL HISTORY

Plaintiff filed her Complaint on June 17, 2020 in Colorado state court.  (ECF No. 4.)  She asserted a total of seven claims: (1) race discrimination in violation of the Equal Protection Clause of the Fourteenth Amendment, brought pursuant to 42 U.S.C. § 1983, against the District and Suppes, (2) race discrimination in violation of Title VII of the Civil Rights Act of 1964, §§ 2000e, *et seq.* ("Title VII"), against the District, (3) retaliation in violation of Title VII against the District, (4) race discrimination in violation of 42 U.S.C. § 1981 against the District and Suppes, (5) retaliation in violation of § 1981 against the District, (6) race discrimination in violation of the Colorado Anti-Discrimination Act, §§ 24-34-301, *et seq.* ("CADA"), against the District, and (7) retaliation in violation of CADA against the District.  (*Id.* ¶¶ 49–122.)

14

Defendants removed the action on July 8, 2020, based on Plaintiff's federal claims brought pursuant to Title VII, § 1981, and § 1983.  (ECF No. 1.)  Defendants filed a motion to dismiss on July 29, 2020, seeking dismissal of the Complaint in its entirety pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).  (ECF No. 16.)  The Court dismissed Plaintiff's retaliation claim under CADA without prejudice for failure to exhaust administrative remedies but dismissed no other claims.  (ECF No. 48.)

On January 3, 2022, Defendants filed their Motion for Summary Judgment, which became ripe on September 9, 2022.  (ECF Nos. 66, 80, 94.)

### IV. ANALYSIS[5]

#### A.   Race Discrimination

Plaintiff alleges the District discriminated against her by failing to hire her for EGTC's Executive Director position in violation of Title VII, CADA, and §§ 1981 and

---

[5] In her response, Plaintiff states that the Court may take judicial notice of the response brief filed by Lindsay in opposition to the motion for summary judgment filed in another civil action in this District, *Barbara Lindsay v. DPS and Stephanie Donner*, Civil Action No. 20-cv-3477-CMA-MEH.  (ECF No. 94 at 13 n.11.)  Additionally, Plaintiff states: "Due to space limitations, much of the substantial evidence of pretext – and it is overwhelming – cannot be included herein. Lindsay's response to DPS's Motion for Summary judgment [Doc. 56 in *Lindsay v. DPS*, No. 20-cv-03477-CMA-MEH] sets forth such evidence fully and forcefully."  (*Id.* at 27 n.15.)

In their reply, Defendants point out that Plaintiff's attempt to incorporate by reference arguments, cases, and evidence contained within the brief filed in *Lindsay v. DPS* is an improper attempt to circumvent the Court's page limitations set forth in WJM Revised Practice Standards III.C.1.  (ECF No. 80 at 2.)

The Court agrees with Defendants and will not consider briefs and evidence from *Lindsay v. DPS*.  The Tenth Circuit has observed that "incorporation by reference is a sorry briefing technique and it seldom (if ever) will be an adequate means to convey an argument to a court."  *Id.* (quoting *Milton*, 521 F. App'x at 668); *see also In re Antrobus*, 563 F.3d 1092, 1097 (10th Cir. 2009) ("[W]e have disapproved of parties adopting their previous filings in lieu of fully setting forth their argument before this court.")).  The Court views Plaintiff's briefing technique of incorporation by reference as an attempt to circumvent the Court's page limits and an improper approach to litigation. The Court cautions Plaintiff's counsel against employing such tactics in future briefing without prior leave of Court.

1983.  (ECF No. 4, Claims 1, 2, 4, and 6.)

    1.    <u>Legal Standard</u>

Plaintiff's Title VII, CADA, and §§ 1981 and 1983 claims are analyzed under the

same standards.  *Stinnett v. Safeway, Inc.*, 337 F.3d 1213, 1219 (10th Cir. 2003);

*Kendrick v. Penske Transp. Services, Inc.,* 220 F.3d at 1220, 1230 (10th Cir. 2000).

    Title VII and CADA claims based on indirect evidence, as in this case, follow the

burden-shifting framework set forth in *McDonnell-Douglas v. Green*, 93 S. Ct. 1817

(1973); *Kendrick*, 220 F.3d at 1230.  Under that framework, a plaintiff must first "raise a

genuine issue of material fact on each element of the prima facie case . . . ."  *Bekkem v.*

*Wilkie*, 915 F.3d 1258, 1267 (10th Cir. 2019) (internal citations omitted).  The burden

then "shifts to the employer to offer a legitimate non-discriminatory reason for its

employment decision."  *Id.*  If the employer does so, "the burden then reverts to the

plaintiff to show that there is a genuine dispute of material fact as to whether the

employer's proffered reason for the challenged action is pretextual—*i.e.*, unworthy of

belief."  *Id.*

    2.    <u>Prima Facia Case</u>

To establish a prima facie case of race discrimination, Plaintiff must show: "(1)

[s]he is a member of a racial minority; (2) [s]he suffered an adverse employment action;

and (3) similarly situated employees were treated differently."  *Trujillo v. Univ. of Colo.*

*Health Scis. Ctr.*, 157 F.3d 1211, 1215 (10th Cir. 1998).

    Defendants do not dispute that Plaintiff can establish a prima facie case of race

discrimination.  (ECF No. 66 at 19.)  However, Defendants argue that they are

nonetheless entitled to summary judgment because Plaintiff cannot demonstrate that

16

their proffered legitimate, non-discriminatory reasons for advancing and hiring Donner were mere pretext for discrimination.  (*Id.*)

3.    Pretext

Once a plaintiff establishes a prima facie case of discrimination, under the *McDonnell-Douglas* burden-shifting analysis, a defendant need only proffer legitimate, non-discriminatory reasons for a decision; it need not prove them.  *Rea v. Martin Marietta Corp.*, 29 F.3d 1450, 1455 (10th Cir. 1994).  The burden then shifts back to the plaintiff to demonstrate that Defendants' articulated reasons are mere pretext for discrimination.  *Id.*

Here, Defendants contend that Hernandez's comments played no role in the employment decisions, the fact that Plaintiff was mistakenly invited to the final interview does not demonstrate pretext, and Plaintiff and Donner had comparable qualifications for the Executive Director position.  (ECF No. 66 at 20–22.)  Therefore, Defendants argue that they had legitimate, non-discriminatory reasons to hire Donner, and Plaintiff cannot demonstrate that their decision was pretextual.  (*Id.*)

A plaintiff may show pretext based on "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in the claimed non-discriminatory reason such that a rational trier of fact could find the reason unworthy of belief.  *Timmerman*, 483 F.3d at 1113.  "A challenge of pretext requires a court to look at the facts as they appear to the person making the [employment] decision, not the aggrieved employee."  *Piercy v. Maketa*, 480 F.3d 1192, 1200 (10th Cir. 2007).  "The relevant inquiry is not whether the proffered reasons were wise, fair or correct, but whether [the employer] believed those reasons to be true and acted in good faith upon those beliefs."

17

*Id.*  Relevant to the issue of pretext is an employer's "good faith perception" of the reason for the adverse employment action, not plaintiff's subjective belief.  *Id.* at 1201. "The courts may not act as a super personnel department that second guesses employers' business judgments."  *Jaramillo v. Colo. Judicial Dep't*, 427 F.3d 1303, 1308 (10th Cir. 2005).

While Defendants offer evidence in support for their arguments that the decision to hire Donner and not Plaintiff was not pretext for race discrimination, Plaintiff also offers circumstantial evidence that the decision could have been racially motivated.  For instance, Plaintiff emphasizes that a jury could find a "significant disparity in qualifications between Lee and Donner."  (ECF No. 94 at 22.)  For support, she points out that Donner was not "threshold qualified for the job, per the job description" because she arguably lacked the relevant experience in higher education and career technical education and was a lawyer without a master's degree in education or a related field. (*Id.*)  By contrast, Plaintiff had worked at EGTC for over a decade and understood the needs of the institution and its students.  (*Id.*)

Further, Plaintiff presents evidence that she was recommended by individuals who worked at EGTC and knew what was required of an Executive Director.  (*Id.*)  By contrast, Donner was recommended by Ferrandino, who admittedly did not understand the job description and was otherwise unfamiliar with the specific requirements of the position.  A jury could infer from this evidence that Donner, a white female, was preselected for the position.

Plaintiff also raises factual disputes regarding her invitation for a final interview with Cordova, which Suppes rescinded.  (*Id.* at 24.)  While Suppes purportedly did not

advance Plaintiff to a final interview due to her leadership abilities and lack of readiness for the position, a reasonable jury could disbelieve those reasons for failing to promote her, particularly in light of the questions Plaintiff raises about Donner's suitability for the Executive Director position.

Accordingly, the Court finds that genuine and significant disputes of material fact concerning whether Suppes's decision not advance Plaintiff to a final interview was based on a discriminatory motive, and as a consequence denies summary judgment on Plaintiff's race discrimination claims.

### 4.   Municipal Liability

In addition to proving the elements above, for claims under Section 1981 and 1983, a plaintiff must also show that an unconstitutional action of the school district employee was taken pursuant to an official policy or custom of the school district or that the employee was a final policymaker for the school district.[6]  *Randle v. City of Aurora*, 69 F.3d 441, 446 (10th Cir. 1995), citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690–91 (1978); *Jett v. Dallas Ind. Sch. Dist.*, 491 U.S. 701, 733 (1989); *Milligan-Hitt v. Bd. of Trustees, Sheridan Cnty., Sch. Dist. No. 2*, 523 F.3d 1219, 1223 (10th Cir. 2008). A school district cannot be held liable for an employee's action under a theory of respondeat superior.  *Randle*, 69 F.3d at 446.  This argument is legal, not factual.  *See Ledbetter v. City of Topeka,* 318 F.3d 1183, 1189 (10th Cir. 2003) (courts examine state laws and policies to determine who is a final policymaker).

---

[6] There is no evidence that the District has an official policy of discrimination or retaliation, nor does Plaintiff argue such an official policy exists.  (ECF No. 94 at 29–31.) Regardless, the District's official policies, AC and GBA, in place at all relevant times, prohibit discrimination and retaliation.  (ECF No. 66-1 at 3–5.)  Further, Plaintiff does not contend there is a custom of discrimination.  (ECF No. 94 at 29–31.)

The Tenth Circuit has enumerated "three elements that help determine whether an individual is a 'final policymaker': (1) whether the official is meaningfully constrained 'by policies not of that official's own making;' (2) whether the official's decision [*sic*] are final—*i.e.*, are they subject to any meaningful review; and (3) whether the policy decision purportedly made by the official is within the realm of the official's grant of authority."  *Randle*, 69 F.3d at 448.

Plaintiff argues that she can establish municipal liability for her §§ 1981 and 1983 claims because Suppes, a final policymaker for the District, discriminated against her by failing to hire her as Executive Director.  (ECF No. 94 at 29.)  However, the Court finds that Suppes is not a final policymaker.

Colorado Revised Statutes § 22-32-109(1)(f)(I) provides that the District's Board of Education (the "Board") has the authority "[t]o employ all personnel required to maintain the operations and carry out the educational program of the district and to fix and order paid their compensation."  Further, § 22-32-110(1)(h) provides that the Board has the authority "[t]o discharge or otherwise terminate the employment of any personnel."  The Board has adopted a policy, Board Policy CBA/CBC, delegating hiring and firing decisions to the Superintendent, unless otherwise required by law.  (ECF No. 66-1 at 6–7.)  Thus, as a matter of law, the final policymaker regarding employment decisions was the Superintendent, not Suppes.  Plaintiff concedes that she has no evidence that the Superintendent, Cordova, discriminated against her when she hired Donner as Executive Director; Plaintiff testified as much at her deposition.  (ECF No. 66-2 at 13–14.)

To the extent Plaintiff argues Suppes was also a final policymaker, the Court

finds this argument is without merit.  (ECF No. 94 at 29–31.)  First, Suppes was "meaningfully constrained" by the District's policy against discrimination, as well as the Board's delegation of hiring authority to the Superintendent, and not to him.  The evidence shows that Suppes's authority extended only to the recommendation of who to advance to the final interview with Cordova and Acevedo.  In Plaintiff's response to Defendants' Statement of Undisputed Material Facts, Plaintiff denies that Cordova had the final hiring authority for the position, but she states that Suppes testified that "Cordova 'could say no' to the candidate he chose to hire, but she 'looked to [him] to run the process,' he was the one who made the decision of who the two finalists were (in contradiction of the panel's finalists), and he recommended that Donner be hired." (ECF No. 94 at 3 ¶ 5.)  This statement confirms that while Cordova entrusted Suppes to run the hiring process and advance the final candidates to her to interview, Cordova was the one who conducted the final interviews and chose the Executive Director. There is simply no evidence that she delegated such authority to Suppes.

Next, the Court examines whether Suppes's decision was final—or subject to any meaningful review.  The evidence shows that Cordova meaningfully reviewed Suppes's decisions.  The fact that Cordova did not exercise her power to veto Suppes's chosen candidate—Donner—is not evidence that Suppes is a final policymaker with respect to the Executive Director hiring decision.  Cordova, in fact, interviewed the final candidates, Bean and Donner, and ultimately chose Donner.  (ECF No. 66-4 at 3.) Although she possesses the authority under the statute to "delegate" personnel decisions, in this case, there is no factual dispute that she chose not to delegate the final hiring decision, as is evidenced by her decision to interview the final candidates

herself and make the ultimate hiring decision for the Executive Director position.  The Court agrees with Defendants' argument that the fact that Cordova interviewed Donner, rather than simply accepting Suppes's recommendation, undermines any argument that Cordova did not exercise her authority.

Finally, the Court analyzes whether the policy decision purportedly made by the official is within the realm of the official's grant of authority.  Here, Suppes exercised proper authority in recommending the finalists to be interviewed; the evidence shows it was Cordova who chose Donner for the position after conducting an independent interview.

Based on the undisputed evidence, the Court finds that Plaintiff's municipal liability claims for race discrimination fail.

5.    <u>Qualified Immunity</u>

Qualified  immunity is a question of law, although disputes of fact that necessarily inform the qualified immunity analysis may go to a jury.  *Maestas v. Lujan*, 351 F.3d 1001, 1007–09 (10th Cir. 2003).  In this case, if the jury finds the facts to be as Plaintiff represents, Suppes discriminated against Plaintiff based on race by recommending Donner, a white individual, over Plaintiff, a black individual.  *See Fisher v. City of Las Cruces*, 584 F.3d 888, 895–902 (10th Cir. 2009) (qualified immunity unavailable at summary judgment where the plaintiff's version of the facts, if believed, would constitute a violation of a clearly established right).  Given the Court's finding that a genuine dispute regarding material facts exists, summary judgment in Suppes's favor on the basis of qualified immunity is not appropriate at this juncture.

**B.    Retaliation**

In the Tenth Circuit, Plaintiff's Title VII and §§ 1981 and 1983 retaliation claims are analyzed in the same manner.  *Kendrick,*  220 F.3d at 1230.  Accordingly, the Court examines them together.

Plaintiff asserts a theory of third-party retaliation against the District and Suppes. She argues that she indisputably engaged in protected opposition to discrimination and participation in a proceeding governed by filing her charge of discrimination, and the District retaliated against her when Donner fired her co-worker, Lindsay, to discredit Lindsay as a witness for Plaintiff.  (ECF No. 94 at 26.)

1.    Legal Standard

To establish a prima facie case of retaliation, a plaintiff must allege "(1) protected opposition to Title VII discrimination or participation in a Title VII proceeding; (2) adverse action by the employer subsequent to or contemporaneous with such employee activity; and (3) a causal connection between such activity and the employer's adverse action." *Berry v. Stevinson Chevrolet*, 74 F.3d 980, 985 (10th Cir. 1996).

2.    Prima Facie Case

Defendants argue that Plaintiff cannot establish a causal connection between Lindsay's termination and Plaintiff's protected activity.  (ECF No. 66 at 25.)  "An employer's action against an employee cannot be *because* of that employee's protected [activity] unless the employer *knows* the employee has engaged in protected [activity.]" *Petersen v. Utah Dep't of Corrs.*, 301 F.3d 1182, 1188 (10th Cir. 2002) (emphasis in the original).

Defendants argue that for Donner to have terminated Lindsay because she

provided Plaintiff with information that Plaintiff used in her discrimination charges,

Donner would have had to know that Lindsay provided information to Plaintiff.  (ECF No.

66 at 25.)  They assert, however, that the evidence shows that Donner did not know

about Lindsay's provision of information until well after Lindsay was terminated.  (*Id.*)  In

her Declaration, Donner states that as of July 31, 2019

> I did not know that Lindsay had "objected" to comments
> made about Lee by one of the panel members, Tatiana
> Hernandez, during the second panel interview debrief.
> Indeed, I did not know that Hernandez had made any
> comments related to Tisha Lee at all.  Nor did I know that
> Lindsay had provided information to Lee that Lee used to file
> discrimination charges.  In fact, I did not know that Lee had
> filed any discrimination charges until August or September
> 2019, after Lindsay's termination, when I was asked by the
> District's counsel to provide information related to my work at
> Galvanize.  I first learned that Lindsay provided information
> to Lee that Lee used in her discrimination charge when
> Lindsay filed her retaliation charge with the CCRD in
> October 2019.  In sum, I did not know that Lindsay had
> engaged in any protected activity until after her employment
> had been terminated.

(ECF No. 66-7 ¶ 23.)

No District employee, other than Plaintiff and Lindsay, knew that Lindsay

provided information to Plaintiff that Plaintiff used to support her discrimination charge.

(ECF No. 66 at 25–26.)  Moreover, Donner was not even aware that Plaintiff had filed a

discrimination charge until after Lindsay had been terminated.  (ECF No. 66-7 at 4–5.)

Therefore, according to Defendants, because Donner did not know about Plaintiff's

protected activity, or that Lindsay assisted Plaintiff, until after Lindsay's termination,

Defendants contend that Plaintiff cannot demonstrate a causal connection between the

discrimination charges and Lindsay's termination.

In response, Plaintiff disputes the proposition that Donner was oblivious to

Plaintiff's filing of charges of discrimination, as well as Lindsay's identity as the panelist who provided her with the basis of those charges.  (ECF No. 94 at 27.)  She argues that Donner's affidavit is a self-serving affidavit that should be subject to cross examination, that the District knew about Plaintiff's charges of discrimination, and that circumstantial evidence permits the inference that Donner knew about the charges and Lindsay's conduct.  (*Id.*)  The Court rejects these arguments for the following reasons.

First, as Defendants correctly emphasize, Plaintiff's assertion that Donner's affidavit is improper is unsupported.  Plaintiff does not use the word "sham" to describe the affidavits in this case, but she implies as much.  (ECF No. 94 at 9 n.7.)  Therefore, the Court discusses whether the affidavits are sham affidavits.

"Sham affidavits, though 'unusual,' arise when a witness submits an affidavit that contradicts the witness's prior testimony."  *Knitter v. Corvias Military Living, LLC*, 758 F.3d 1214, 1218 n.3 (10th Cir. 2014) (quoting *Law Co. v. Mohawk Const. & Supply Co.*, 577 F.3d 1164, 1169 (10th Cir. 2009)).  Although "[a]n affidavit may not be disregarded solely because it conflicts with the affiant's prior sworn statements," the Court may nonetheless disregard a conflicting affidavit if it "constitutes an attempt to create a sham fact issue."  *Mohawk*, 577 F.3d at 1169; *see also Knitter*, 758 F.3d at 1218 n.3.

In determining whether an affidavit creates a sham fact issue, courts consider whether:

> "(1) the affiant was cross-examined during his earlier testimony; (2) the affiant had access to the pertinent evidence at the time of his earlier testimony or whether the affidavit was based on newly discovered evidence; and (3) the earlier testimony reflects confusion which the affidavit attempts to explain."

*Mohawk*, 577 F.3d at 1169 (quoting *Ralston v. Smith & Nephew Richards, Inc.*, 275

F.3d 965, 973 (10th Cir. 2001)).

This is not an instance of a witness submitting an affidavit that contradicts the witness's prior testimony.  *See Knitter*, 758 F.3d at 1218 n.3.  Notably, Plaintiff does not once point to where Donner's affidavit conflicts with her prior sworn statements.  (ECF No. 94 at 9 n.7, at 27.)  Instead, Plaintiff complains, without citation to case law or the record, that:

> Defendants have taken this tact with all of the relevant witnesses who testified—providing affidavits that support their case without being subject to cross-examination.  The "testimony" was not provided in deposition nor previously disclosed, and never subject to cross-examination.

(ECF No. 94 at 9 n.7.)

> This is a good example of this troubling trend.  Defendants counsel clearly worked with Donner to write her affidavit in the vaguest most meaningless possible terms and now seek to inject the same as an "undisputed fact" into this case.

(*Id.* at 9 n.8.)

> Circumstantial evidence, including compelling evidence of the pretextual nature of Lindsay termination as outlined in the "pretext letter," permits the jury to draw the inference that Donner had indeed been informed by DPS management or legal counsel of the nature of Lindsay's involvement in Lee's Charge.[7]

(*Id.* at 13.)

> Circumstantial evidence allows an inference that Hermsen told Donner that Lindsay had objected to the racist comments during the panel and had given Lee the information for her charges.

(ECF No. 94 at 18.)  Despite her numerous protestations, Plaintiff ignores the fact that she took Donner and Hermsen's depositions.  (ECF No. 80-1; ECF No. 71-9.)  Plaintiff's

---

[7] This unsupported argument of counsel improperly appears in Plaintiff's Response to Statement of Undisputed Material Facts.  (ECF No. 94 at 13.)

attorney asked Donner if she knew Plaintiff filed EEOC charges, and Donner answered that she found out about the charges in late August or early September 2019, which was after Lindsay's termination.  (ECF No. 80-1 at 2.)  Such deposition testimony is *consistent* with her affidavit.  Plaintiff's argument that Donner's statement—that she did not know Lindsay provided information to Plaintiff—should not be believed because it was not subject to cross examination fails.  Plaintiff fails to acknowledge that she had an opportunity to ask Donner about this critical issue during her deposition, but failed to do so.  Defendants also point out that she did not propound any written discovery on the issue, nor did she ask if Hermsen told Donner that Lindsay objected to purportedly racist comments during the panel interview.  (ECF No. 80 at 12.)  As those topics were not addressed in the depositions or in written discovery, in the Court's view, Donner could properly attest to them in her affidavit.  (ECF No. 66-7.)

The same analysis applies to Hermsen's affidavit, in which he declares:

> Nor did I tell her about Hernandez' comments about Lee during the second panel interview debrief. Nor did I tell her that Lindsay provided information to Lee that Lee used to file discrimination complaints, because I did not know that information.

(ECF No. 66-3 ¶ 11.)  In sum, this is not a circumstance which implicates the sham affidavit doctrine.

Plaintiff further argues that circumstantial evidence permits the inference that Donner knew that Plaintiff filed charges of discrimination and that Lindsay was the person who told Plaintiff about the comments underpinning the charges.  (ECF No. 94 at 27.)  But Plaintiff has produced no evidence to create a genuine issue of material fact showing that Donner knew that Plaintiff filed discrimination charges before Lindsay was

terminated or that Lindsay told Plaintiff what Hernandez said.

Plaintiff also argues that temporal proximity supports a strong inference of retaliatory motive, where only two weeks passed between Plaintiff filing her second charge of discrimination and Donner firing Lindsay. (ECF No. 94 at 26.) The Court acknowledges the Tenth Circuit authority Plaintiff cites, which stands for the proposition that when the adverse employment action is very closely connected in time with the protected activity, a court may infer a retaliatory motive. *Ramirez v. Okla. Dep't of Mental Health*, 41 F.3d 584, 596 (10th Cir. 1994). However, in light of Donner's affidavit, and given that Plaintiff has failed to come forward with any controverting evidence showing that Donner *did* know Lindsay provided information to Plaintiff which supported her charges of discrimination, the Court finds it cannot make this inference, even given the timeframe Plaintiff identifies.

Moreover, and as Defendants underscore, there were multiple people in the second panel debrief, any one of whom could have provided information to Plaintiff; Donner did not have to necessarily infer or conclude that it was Lindsay. (*Id.*)

Because Plaintiff has not demonstrated a causal connection, she cannot establish a prima facie case of retaliation, and thus, her retaliation claim fails.

3.   Pretext

Because the Court finds that Plaintiff cannot establish a prima facie case, it need not proceed to determine whether Defendants' proffered reasons for terminating Lindsay were pretextual.

4.   Municipal Liability

Based on the Court's determination that no reasonable jury could conclude that

Donner retaliated against Plaintiff by firing Lindsay, Plaintiff's *Monell* claims based on retaliation against the District necessarily fail.  *Cf. Hinton v. City of Elwood*, 997 F.2d 774, 782 (10th Cir. 1993) ("A municipality may not be held liable where there was no underlying constitutional violation by any of its officers.").

      5.    <u>Qualified Immunity</u>

In the section of her response addressing retaliation, Plaintiff does not address qualified immunity in connection with Suppes.  (ECF No. 94 at 32.)  On this basis, and the fact that the evidence demonstrates that Suppes was not involved in the circumstances of retaliation alleged in this case, the Court agrees with Defendants that Plaintiff has conceded she has no retaliation claim against Suppes.  (ECF No. 80 at 15 n.8.)  Therefore, to the extent necessary, the Court finds Suppes is entitled to qualified immunity from Plaintiff's retaliation claim.

**V. CONCLUSION**

For the reasons stated above, the Court ORDERS that:

1.    Defendants' Motion for Summary Judgment (ECF No. 66) is:

    a.    GRANTED as to all claims asserting retaliation under all statutes;

    b.    GRANTED as to all claims asserting municipal liability;

    c.    GRANTED to the extent Suppes is entitled to qualified immunity from Plaintiff's retaliation claims; and

    d.    DENIED in all other respects; and

2.    The Final Trial Preparation Conference remains set for November 22, 2022 at 11:00 a.m., as does a five-day jury trial set to commence on December 5, 2022. (ECF Nos. 93 and 76.)

Dated this 6th day of October, 2022.

BY THE COURT:

_____
William J. Martinez
United States District Judge